**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 24-88** |
| | : | |
| **NORMAN COPPER** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                **July 25, 2025**

This District's Grand Jury charged Norman Copper with, on or about January 24, 2024, knowingly and intentionally possessing with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine; knowingly possessing firearms in furtherance of a drug trafficking crime; and being a felon in possession of a firearm. We proceeded to trial after months of discovery and after resolving several evidentiary concerns arising from Mr. Copper's statements on recorded lines with incarcerated persons. Mr. Copper discussed much of his drug and illicit gun activity (albeit through code words) in recorded telephone calls with persons in custody.

The jury returned a verdict of guilty on all charges. Mr. Copper now moves for a new trial or judgment of acquittal challenging pretrial rulings and the weight of the evidence necessary to convict. He also challenges the admission of certain exhibits and lay opinions as overly prejudicial or unfounded. We studied the extensive record and find no basis to grant Mr. Copper an acquittal or new trial.

### I.    Evidence adduced at trial

Mr. Copper pleaded guilty twelve years ago to crimes in state court and he remained under state court supervision in 2024. The United States specifically demonstrated Mr. Copper's earlier

offenses through its witnesses and other evidence: Mr. Copper and another individual approached someone in the street on the night of November 20, 2010, produced firearms, and began shooting at him, striking him one time in the left thigh. The following night, Mr. Copper and another individual forced their way into an apartment where four men were living. Mr. Copper's companion forced the men to lie face down on the floor at gunpoint while Mr. Copper went upstairs and searched the second floor for money. Finally, Mr. Copper and another individual approached two people on the street the night of November 22, 2010. Mr. Copper pointed a gun at them, demanded money, and hit one of the victims in the head with his gun. Mr. Copper pleaded guilty in 2013 to one charge of attempted murder and two charges of robbery for the events on November 20, 21, and 22, 2010. Each of these crimes was punishable by imprisonment for a term exceeding one year. Mr. Copper remained under state court supervision for these 2010 crimes in 2024.

The Commonwealth continued to monitor Mr. Copper through a GPS device following his release from state custody. The Commonwealth's supervision of Mr. Copper included designating his approved address in Philadelphia as subject to search. Intelligence Analyst Damien Msciaz learned while monitoring phone calls within the Department of Corrections of frequent communications between Mr. Copper and Herman Tuggles, an incarcerated individual. Intelligence Analyst Msciaz became suspicious Messrs. Copper and Tuggles were using coded language to talk about firearms and drugs on phone calls from November 2023 through January 2024. Intelligence Analyst Msciaz learned of similar conversations between Mr. Copper and another incarcerated individual, Robert Davis, in January 2024. Intelligence Analyst Msciaz passed this information to local law enforcement.

Detectives for the Upper Merion Township Police Department reviewed the calls and then opened an investigation into Mr. Copper. They began conducting physical surveillance of Park

Square Apartments in King of Prussia in early January 2024. They believed Mr. Copper might be conducting illegal activities from a King of Prussia apartment as his GPS device showed he spent a large portion of his days there. The detectives learned Mr. Copper's girlfriend, Orit King, lived in apartment 4320. They observed Mr. Copper frequently driving his Toyota Camry to the apartment building, entering the building, and going to apartment 4320. The detectives obtained video footage of Mr. Copper leaving the apartment and going down the hall in the direction of a storage unit with a black backpack. After about a month and a half of conducting surveillance, the detectives obtained search warrants to search Mr. Copper's person, his car, and apartment 4320.

Detectives executed the warrants at the Park Place Apartments on January 24, 2024. They recovered a Glock 26 GEN5 9mm semi-automatic pistol registered to Ms. King from inside apartment 4320 and discovered several personal effects belonging to Mr. Copper including medication, mail, his passport, his social security card, and a large amount of cash. The detectives also found a key for the storage unit which led them to apply for an additional search warrant.

The detectives obtained a warrant for the storage unit the same day. They recovered from the unit three additional firearms—a Century Arms Nova Draco 9mm semi-automatic pistol, a Century Arms Nova WAR-M 9mm semi-automatic rifle, and a Springfield Armory XDM-10 10mm semi-automatic pistol—and approximately 1.6 pounds of methamphetamine. The detectives found the Springfield firearm and the methamphetamine together in a black backpack along with a digital scale, a box of rubber gloves, a box of disposable face masks, several Ziplock bags, and a plastic scooper. The detectives also recovered a folded dollar bill with methamphetamine residue on it which had fallen from the backpack. Police officers located Mr. Copper at a Chick-fil-a restaurant near the apartment complex and arrested him. He did not have firearms or drugs on his person at the time of his arrest.

The District's Grand Jury returned a three-count Indictment charging Mr. Copper with, or about January 24, 2024, knowingly and intentionally possessing with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine found in and around him at an apartment complex in Upper Merion Township; knowingly possessing firearms in furtherance of a drug trafficking crime; and being a felon in possession of a firearm.[1] We bifurcated the trial in two phases at Mr. Copper's request. Phase one concerned the drug and possession of firearms for drug trafficking charges; phase two concerned the felon in possession of a firearm charge.

### *Adduced evidence of Mr. Copper's possession of methamphetamine with intent to distribute and possession of firearms to further drug trafficking.*

During the first phase of the trial (possession of methamphetamine with intent to distribute and possession of firearms in furtherance of drug trafficking), the United States introduced testimony from an intelligence analyst for the Pennsylvania Department of Corrections whose job included listening to phone calls of incarcerated individuals to screen for illicit activity[2]; testimony from two detectives for the Upper Merion Township Police Department[3]; testimony from the community director of Park Squares Apartments in King of Prussia, an apartment complex which Mr. Copper frequently visited[4]; testimony from a special agent and an officer for the Bureau of Alcohol, Tobacco, Firearm and Explosives[5]; testimony from Mr. Copper's former girlfriend[6]; testimony from two forensic chemists employed by a lab accredited to perform toxicological and drug chemistry testing[7]; testimony from two DNA analysts[8]; and expert testimony from a lieutenant for the Montgomery County District Attorney's Office.[9] The United States adduced evidence of Mr. Copper's GPS location showing he frequently visited an apartment in King of Prussia[10] and evidence of police officers' surveillance of the apartment including videos and photographs showing Mr. Copper's unrestricted access to the apartment unit and storage unit from

which firearms and methamphetamine were later seized.[11] The United States introduced physical evidence seized from the apartment and storage unit including four firearms, bags of methamphetamine, a box of gloves, a plastic scooper, and a scale.[12] The United States also introduced text messages, phone calls, and video calls between Mr. Copper and other individuals— some of whom were incarcerated—indicating Mr. Copper's familiarity with and/or possession of firearms and methamphetamine.[13]

### *Adduced evidence of Mr. Copper being a felon in possession of a firearm.*

During the second phase of the trial (felon in possession of a firearm), the United States adduced testimony from a former assistant district attorney for the Philadelphia District Attorney's Office and the docket information and guilty plea colloquies from Mr. Copper's three state court convictions in 2013.[14]

### *The jury returns guilty verdicts on all charges in two bifurcated phases.*

Our jury deliberated at length before finding Mr. Copper guilty of knowingly and intentionally possessing with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine; knowingly possessing firearms in furtherance of a drug trafficking crime; and felon in possession of a firearm.

## II.  Analysis

Mr. Copper now moves for acquittal or a new trial under Federal Rules of Criminal Procedure 29 and 33.[15] He presents two main grounds: (1) the United States adduced insufficient evidence from which a jury could find Mr. Copper guilty of any of the three counts, and (2) Mr. Copper suffered extreme prejudice from the introduction of certain evidence at trial.

We disagree. The jury heard overwhelming evidence of Mr. Copper's guilt. And Mr. Copper did not suffer prejudice warranting a new trial.

**A. We deny Mr. Copper's motion for acquittal or a new trial on the intent to distribute 500 grams or more of methamphetamine.**

The Grand Jury charged Mr. Copper with possession with intent to distribute a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). To obtain a conviction for this charge, the United States had to prove (1) Mr. Copper possessed a mixture or substance containing a detectable amount of a controlled substance on January 24, 2024; (2) he knowingly or intentionally possessed the controlled substance; (3) he intended to distribute the controlled substance; and (4) the controlled substance was methamphetamine.

Mr. Copper argues the United States presented insufficient evidence to establish the third element of intent to distribute because Lisa Greear, the Community Director of the Park Square Apartments, swore she never received complaints of drug dealing in apartment 4320; the police conducting surveillance of Mr. Copper never saw him engage in a drug transaction or transport methamphetamine out of the apartment for distribution; Mr. Copper had no drugs or guns on his physical person or in his car when the police conducted a search on January 24, 2024; the United States' only adduced evidence of Mr. Copper possessing methamphetamine was a dollar bill in the storage unit (with a trace amount of methamphetamine) for personal use; Orit King, Mr. Copper's ex-girlfriend, swore she never saw Mr. Copper sell drugs; the text, audio, and video messages adduced by the United States did not demonstrate Mr. Copper distributed drugs; and the United States' expert witnesses did not establish Mr. Copper intended to distribute methamphetamine.[16] Mr. Copper also points to several of the questions posed by the jury which "clearly reflected the fact that the jury was wrestling with the lack of evidence [of] the Defendant's intent to distribute Methamphetamine."[17]

The United States responds a rational juror could have concluded Mr. Copper possessed the methamphetamine to sell it based on the trial evidence. Lieutenant Erick Echeverria, a detective with the Montgomery County Detective Bureau, swore the weight and value of the recovered drugs were consistent with distribution; the scale, bags, face mask, and gloves located in the same backpack as a portion of the methamphetamine demonstrated Mr. Copper's intention to sell it; and the jargon Mr. Copper used in his calls and messages did not suggest he used the methamphetamine for personal use but rather indicated his intent to sell it.[18] Mr. Copper's ex-girlfriend, Ms. King, also swore Mr. Copper sold methamphetamine. She knew this because although she never saw Mr. Copper use methamphetamine, he told her he sold methamphetamine; she accompanied Mr. Copper in the car to one drug transaction; she heard him discussing drugs and drug runs; and he kept methamphetamine in a black Levi's backpack like the one recovered by law enforcement.[19] The United States also argues the jury could infer Mr. Copper sold drugs from numerous text messages and phone calls introduced into evidence.[20] The lack of proof of hand-to-hand drug sales is immaterial because an intent to distribute can be proven through circumstantial evidence.[21] And the jury's "questions regarding the element of intent to distribute does not call into question the reasonableness of their verdict."[22]

We agree with the United States: the jury saw and heard ample circumstantial evidence to convict Mr. Copper of possession with intent to distribute. For instance, Lieutenant Echeverria swore certain audio clips of Mr. Copper's phone calls suggested "a drug delivery[,]" and "[w]hen you go to deliver those drugs you have to bring a gun."[23] Lieutenant Echeverria also swore "a user would not stockpile" the amount of methamphetamine Mr. Copper possessed and the scale, scoop, bags, gloves, and face mask recovered with the drugs are "typical of bagging up . . . for resale[]" and are not "used for personal use."[24] Ms. King likewise swore Mr. Copper had the drugs not

because he intended to use them but because he intended to distribute them. She swore she accompanied Mr. Copper to a drug deal on at least one occasion. She did not see Mr. Copper exchange drugs for money because she stayed in the car, but she knew he was selling drugs because she saw him package the drugs before they left the house.[25] A reasonable juror could conclude from the testimony of Lieutenant Echeverria and Ms. King (despite the presence of the dollar bill in the storage unit) Mr. Copper had the drugs because he intended to sell them. Many of the text messages and phone calls the United States introduced into evidence further support this conclusion. Perhaps most notable are the text messages where Mr. Copper and "Shawn Trap" discuss "wash[ing] the stuff" with coffee filters, which, according to Lieutenant Echeverria, is a process drug dealers use to purify methamphetamine.[26] Even if the text messages and phone calls do not explicitly reference drug dealing, the jury could have (and obviously did) find compelling Lieutenant Echeverria's sworn testimony the communications were about dealing drugs.

Mr. Copper's argument concerning the *lack* of certain evidence does not save the day. He argues, for instance, neither his ex-girlfriend Ms. King nor the police officers surveilling him saw him selling drugs, and he had no drugs or guns on his person or in his car when the police searched his body and his car on January 24, 2024. We recognize the jury saw no direct evidence of Mr. Copper selling drugs. But the lack of direct evidence cannot disturb the jury's findings; proof of intent to distribute can be shown through circumstantial evidence.[27] And, as summarized above, the jury heard substantial circumstantial evidence of Mr. Copper selling drugs. The fact the jury submitted several questions during its deliberations "does not provide cause to question the guilty verdicts."[28] The evidence was more than sufficient to convict Mr. Copper for possession with intent to distribute when viewed in the light most favorable to the United States for the purposes of Rule 29 or when we exercise our own judgment of the United States' case for the purposes of Rule 33.

We decline to grant Mr. Copper an acquittal on the possession with intent to distribute 500 grams or more of methamphetamine charge because he has not shown "no rational trier of fact could have found him guilty beyond a reasonable doubt."[29] We decline to grant Mr. Copper a new trial on the same charge because he has not established "a serious danger . . . that an innocent person has been convicted."[30]

### B. We deny Mr. Copper's motion for acquittal or a new trial for possessing a firearm in furtherance of a drug trafficking crime.

The Grand Jury charged Mr. Copper with possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (c)(1)(B)(ii). To obtain a conviction for this charge, the United States had to prove (1) Mr. Copper committed the crime of possession with intent to distribute a mixture and substance containing a detectable amount of methamphetamine; and (2) Mr. Copper knowingly possessed a firearm in furtherance of this crime.

Mr. Copper argues the United States failed to prove both elements. We need not address the first element because we already decided the United States met its burden to prove Mr. Copper possessed methamphetamine with intent to distribute. As to the second element, Mr. Copper argues the United States presented no evidence establishing he possessed any of the subject firearms (a Century Arms Nova Draco 9mm semi-automatic pistol, a Century Arms Nova WAR-M 9mm semi-automatic rifle, a Springfield Armory XDM-10 10mm semi-automatic pistol, and a Glock 26 GEN5 9mm semi-automatic pistol) in furtherance of the distribution of methamphetamine. He argues his ex-girlfriend Ms. King, not Mr. Copper, legally owned the Glock 26 GEN 5; neither Ms. King nor any of the detectives surveilling Mr. Copper testified he removed any of the firearms from the storage unit or the apartment; none of the weapons contained Mr. Copper's fingerprints; the text, audio, and video messages adduced by the United States were sent before January 24, 2024 and did not show Mr. Copper used the weapons in furtherance of drug trafficking; and the

United States' expert witnesses did not establish Mr. Copper possessed the firearms in furtherance of drug trafficking on January 24, 2024—their opinions concerned Mr. Copper's activities on the dates of the text, audio, and video messages.[31]

The United States counters the evidence is more than sufficient for a jury to find Mr. Copper possessed the firearms: Mr. Copper's access to the firearms; his DNA on the firearms coupled with the expert witnesses' testimony of high match statistics; and his discussions of the firearms on prison calls and through iCloud communications established his constructive possession of the weapons.[32] The United States argues it established Mr. Copper possessed the firearms in furtherance of drug trafficking because the detectives found the firearms in close proximity to the drugs and Mr. Copper's open discussions of the firearms in phone calls and iCloud messages showed he wanted to let other people know he had "protection" for drug dealing purposes.[33]

We agree with the United States: the jury heard sufficient evidence to convict Mr. Copper of possessing one or more firearms in furtherance of drug trafficking. We start with whether a reasonable juror could have concluded Mr. Copper possessed firearms. The United States relied on a theory of constructive possession. "Constructive possession exists if an individual knowingly has both the power and intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons."[34] Our Court of Appeals found sufficient evidence of constructive possession in *United States v. Webster* because Mr. Webster lived in the apartment where probation officers located a firearm, had "full and unfettered access to . . . the unlocked hallway closet where the firearm was found," and "the apartment had recently been robbed, which a reasonable jury could infer provided Webster with a motive to get a gun to protect himself . . . ."[35] Here, similarly, the United States proved Mr. Copper had unrestricted access to the firearm in the apartment where he frequently stayed with Ms. King and to the other three firearms recovered

from the storage unit down the hall.[36] It is true, as Mr. Copper points out, the Glock found in the bedroom was registered to Ms. King, not Mr. Copper. But both the Glock and the Draco had traces of Mr. Copper's DNA. The United States' expert witness William Allan from Cybergenetics, a company specializing in the analysis of complex DNA mixtures, swore it is 38.3 trillion times more probable the data shows the DNA on the Glock matches Mr. Copper's DNA than a coincidental match.[37] He swore it is 4.82 quintillion times more probable the data shows the DNA on the Draco matches Mr. Copper's DNA than a coincidental match.[38] The phone calls and text messages adduced by the United States further established Mr. Copper's constructive possession of the weapons because he discussed and/or sent photographs of firearms which appeared to be the same as those recovered from the storage unit.[39] Notably, the United States introduced into evidence a photograph Mr. Copper sent to Shawn Trap of the Springfield lying on his own lap while he sat in the driver's seat of his 2017 Toyota Camry.[40] We find the United States more than met its burden to show constructive possession.

We next ask whether a reasonable juror could have concluded Mr. Copper possessed the firearms *in furtherance of drug trafficking.* This, too, we answer in the affirmative. Among other things, the proximity of a firearm to drugs or drug profits and the circumstances under which the weapon is found are relevant in determining whether the possession of a firearm helped advance a drug trafficking crime.[41] The United States introduced testimony and photographs showing Mr. Copper kept the firearms in close proximity to the methamphetamine, with three of the firearms located in the same storage unit as the drugs and the fourth firearm located in the apartment bedroom right down the hall.[42] The police recovered the Springfield from the same Levi's backpack used to stash some of the methamphetamine.[43] The United States also adduced evidence some of the firearms were equipped with extended magazines or silencers. Lieutenant Echevarria

opined these modifications make it more likely Mr. Copper used the firearms in furtherance of drug trafficking.[44] The Lieutenant also swore, in his experience, drug trafficking and the use of firearms "go together[,]" and Mr. Copper likely spoke about having firearms and sent photographs of them to send the message "I am protected if you try to come after me."[45]

Mr. Copper's argument on this count is not compelling. He argues the testimony of Ms. King and the police officers shows Mr. Copper "never removed any guns from the apartment or the storage unit."[46] But the United States introduced contrary evidence (*e.g.*, the picture of the Springfield on Mr. Copper's lap in his car) from which a jury could plainly conclude he removed at least one of the firearms from the apartment. Mr. Copper also argues his fingerprints were not on the firearms and the DNA laboratory results from Bode Technologies were inconclusive.[47] But the United States introduced additional evidence from Cybergenetics suggesting a high match between the DNA on the firearms and Mr. Copper's DNA. Mr. Copper lastly argues the United States did not tie Mr. Copper's text messages and phone calls about the firearms to his drug trafficking.[48] In fact, the United States introduced Lieutenant Echevarria's testimony opining Mr. Copper sent texts and talked about his firearms to send a message to anyone considering "coming after" his drug stash.

Mr. Copper presented a thoughtful defense. But now he essentially wants us to reweigh any evidence suggesting he did not possess firearms in furtherance of drug trafficking against the United States' contrary evidence. We "do not weigh evidence or determine the credibility of witnesses in making [our] determination[]" on a Rule 29 motion for acquittal.[49] A rational juror could have found Mr. Copper guilty beyond a reasonable doubt.[50] Nor do we find the jury's verdict contrary to the weight of the evidence under Rule 33.[51] The evidence overwhelmingly allowed the

jury to find Mr. Copper guilty of possessing a firearm in furtherance of the demonstrated drug trafficking crime.

We decline to grant Mr. Copper an acquittal or new trial on this charge.

### C. We deny Mr. Copper's motion for acquittal or a new trial on the felon in possession of a firearm charge.

The Grand Jury also charged Mr. Copper with being a felon in possession of a firearm. To obtain a conviction for this charge, the United States had to prove: (1) Mr. Copper knowingly possessed a firearm and/or ammunition; (2) at the time of the charged act, Mr. Copper held the status of a convicted felon barring him from possessing a firearm and/or ammunition; (3) at the time of the possession, Mr. Copper knew he had earlier been convicted in a court for a term exceeding one year and knew he had been convicted of a crime punishable by imprisonment for more than one year; and (4) Mr. Copper's firearm and/or ammunition traveled in interstate commerce. The Grand Jury also charged Mr. Copper with the enhanced penalty provision of being an armed career criminal under 18 U.S.C. § 924(e). This provision required the United States to prove Mr. Copper has three earlier convictions by any court and he committed those three earlier offenses on different occasions.[52]

Mr. Copper argues the United States presented insufficient evidence to establish his three earlier offenses occurred on different occasions. Mr. Copper committed two robberies and an attempted murder on November 20, 21, and 22, 2010, respectively.[53] He argues the United States could have presented evidence such as the victims, witnesses, or police officers involved in the three crimes to establish they occurred on different occasions.[54] The United States instead only brought Assistant District Attorney Erin Boyle—the prosecutor in Mr. Copper's earlier cases—to the stand to read the factual summaries of the three offenses.[55] Mr. Copper claims he did not admit to these factual scenarios; "his attorney merely indicated that the defense was not contesting the

same."[56] Mr. Copper argues this is not the same as admitting to the factual scenarios and the prosecution cannot use at trial the fact a defendant remained silent in the face of accusation under *Miranda v. Arizona*.[57] Accordingly, the United States "presented nothing more than hearsay summaries which were never adopted by the Defendant."[58]

The United States simply responds Assistant District Attorney Boyle's testimony was sufficient to establish Mr. Copper's three earlier offenses occurred on three separate occasions.[59]

We agree with the United States, although our decision rests on a slightly more fulsome study of *Miranda* than the United States offers. The Supreme Court in *Miranda* held the police must warn people of their constitutional rights before interrogating them or their statements cannot be used as evidence at trial.[60] Because "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation[, t]he prosecution may not . . . use at trial the fact that he stood mute or claimed his privilege in the face of accusation."[61] It is unclear what the Court's holding in *Miranda* has to do with the situation at bar. The United States did not point to Mr. Copper's silence at trial about his three earlier convictions as proof of his guilt for being a felon in possession of a firearm. The United States instead offered Assistant District Attorney Boyle's testimony about Mr. Copper's three earlier guilty pleas as evidence the three offenses were separate events. So, to the extent Mr. Copper is arguing the United States' evidence implicates his Fifth Amendment privilege, we are unconvinced.

We are also unconvinced by Mr. Copper's argument pleading guilty to the three earlier offenses does not mean he admitted to the factual scenarios of each offense. "[U]nder Pennsylvania law, a guilty plea constitutes an admission to all of the facts alleged in the indictment."[62] We do not find it material Mr. Copper did not explicitly admit the facts of each of his three earlier offenses at his March 2025 trial in this Court. The United States established Mr. Copper agreed to the factual

14

basis of each of his three earlier offenses just by offering evidence Mr. Copper pleaded guilty to those crimes in state court on November 5, 2013. When asked whether Mr. Copper or his attorney would have to agree to the facts involving his three charged offenses to enter into a guilty plea, Assistant District Attorney Boyle swore: "That's correct. . . . [I]f the defendant or through his attorney ever said like that's not the facts that I'm pleading to, then, obviously that would be a problem[.]"[63] A rational juror could have concluded Mr. Copper already admitted to the facts of each earlier offense without Mr. Copper verbally reiterating that at his March 2025 trial.

This leaves only Mr. Copper's hearsay argument. He argues Assistant District Attorney Boyle's testimony about his earlier offenses constitutes "nothing more than hearsay summaries which were never adopted by the Defendant."[64] But Mr. Copper's counsel did not raise a hearsay objection to Assistant District Attorney Boyle's testimony at trial.[65] Our Court of Appeals instructs "a party may not seek a new trial on the basis of objections to evidence not brought to the court's attention at the original trial."[66]

We conclude Mr. Copper's arguments lack merit and/or are waived because he did not object to the admissibility of the United States' evidence. A rational juror could have found Mr. Copper's three earlier offenses took place on separate occasions based on Assistant District Attorney Boyle's testimony, and the jury's verdict is not contrary to the weight of the evidence.

We decline to grant Mr. Copper an acquittal or new trial on the felon in possession of a firearm charge.

### D. We deny Mr. Copper a new trial based on the United States' introduction of text messages and audio recordings.

Mr. Copper asks for a new trial because we permitted the United States to introduce certain evidence which Mr. Copper largely moved unsuccessfully to exclude pre-trial. We disregard most of these arguments as we already considered them at length when we ruled on the parties' motions

in limine. But some of the issues briefed by Mr. Copper arose at trial. We consider those issues more closely.

### 1. We properly admitted the United States' evidence obtained through search warrants.

Mr. Copper argues he is entitled to a new trial because he suffered prejudice at trial when the United States introduced evidence obtained through search warrants lacking probable cause. Mr. Copper claims the search warrant for apartment 4320 lacked probable cause because no evidence supported the suspicions of Mr. Copper's parole officer that Mr. Copper possessed a firearm; the affidavit of probable cause did not otherwise indicate illegal drug or gun activity happening at the apartment where Mr. Copper did not even live; and the recorded prison calls where Mr. Copper references gun and drug trafficking were too "stale" to support a search.[67] Mr. Copper relies on the same grounds to challenge the search warrants for the storage unit and Mr. Copper's car.[68] Mr. Copper argues the good faith exception to the exclusionary rule does not apply to the evidence obtained under the search warrants and the fruits of all three searches should have been suppressed.[69]

The United States responds Mr. Copper seeks to relitigate our pretrial rulings on the admissibility of certain evidence and the relief he seeks is more properly advanced on appeal than in a post-trial motion.[70] The United States argues Mr. Copper's disagreement with our decision is not a basis for a new trial under Rule 33.[71] The United States asserts his Motion is essentially a motion for reconsideration, but there has been no change in the law and no clear or manifest injustice, so we should not reconsider our decision on Mr. Copper's pretrial motion to suppress physical evidence.[72]

We agree with the United States. We may "order a new trial only if [we] believe[] that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has

been convicted."[73] We must consider whether our decision to admit the United States' evidence from the challenged search warrants created a serious danger the jury convicted an innocent person. We do not think it did. "To find probable cause to search, there needs to be a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"[74] "[D]irect evidence is not required for the issuance of a search warrant."[75] "Instead, probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested."[76]

Mr. Copper argues the search warrants for the apartment, the storage unit, and his car lacked probable cause. But he already made these arguments in his August 19, 2024 motions in limine and we considered them at length.[77] We applied a deferential review of state court Judge O'Neill's and Judge Barnes's probable cause rulings and explained the recorded prison calls, which took place weeks or months before the warrant application, were not "stale" in the context of an ongoing narcotics investigation.[78] We also found the information obtained from Mr. Copper's GPS tracking device and police officers' detailed surveillance of the apartment, combined with the information obtained from the recorded prison calls, created a fair probability Mr. Copper used the apartment to stash firearms and drugs.[79] Our evidentiary rulings were proper.

Mr. Copper "does not meet the serious injustice standard of Rule 33 to warrant a new trial."[80]

### 2. The limited Rule 404(b) evidence did not create a serious injustice requiring a new trial.

Mr. Copper next argues he deserves a new trial because the United States adduced irrelevant and unduly prejudicial text messages, video recordings, and audio recordings as evidence of other bad acts under Federal Rule of Evidence 404(b). According to Mr. Copper, we should not have admitted the following exhibits:

- Exhibit 4(a) (audio recording dated 12/21/23 where Mr. Copper discusses a "two piece chicken nugget" and "Dukes of Hazard") is irrelevant and the United States impermissibly used it as propensity evidence. This evidence also confused the jury and/or wasted time. Our March 13, 2025 Order required the United States to connect the call to the firearms charged in the Indictment, which the United States did not do.

- Exhibit 4(b) (audio recording dated 1/1/24 where Mr. Copper uses words including "Drake" and "Romania") should not have been admitted because the United States' expert witnesses called to interpret the coded language for the jury could not interpret the language clearly and unequivocally. The people using the coded language did not even understand the code; therefore, the experts' testimony on the coded language was speculative. This exhibit is irrelevant because it has no connection to the charged offenses, meaning it is propensity evidence.

- Exhibit 4(c) (audio recording dated 1/17/24 which picked up a background conversation between Mr. Copper and Ms. King about "smaller bags") is irrelevant and we erred in admitting it because the United States did not charge Ms. King with a crime and merely requesting "smaller bags" is not a bad act. The danger of unfair prejudice outweighed the probative value.

- Exhibit 6(q) (text messages dated 12/23/23 and 12/24/23 where someone labeled "Baby" contacts Mr. Copper to buy a Taurus or Glock firearm) should have been excluded because jurors may have speculated about Baby's identity, the conversation is remote in time from the charged offenses (it took place at least one month prior) and admitting this evidence to establish Mr. Copper's knowledge of the operation of this type of firearm does not bear on whether Mr. Copper possessed firearms/possessed firearms in furtherance of a drug trafficking crime.

- Exhibit 6(r) (text messages dated 12/28/23 where someone labeled "Steve" sent Mr. Copper a picture of five handguns) was irrelevant and therefore prejudicial because "Steve" was never alleged to be a co-conspirator of Mr. Copper and Mr. Copper was not charged with gun trafficking.

- Exhibit 6(y) (text messages dated 1/5/24 where Shawn Trap texts Mr. Copper about using "coffee filters . . . to wash the stuff") was irrelevant and the United States should not have been permitted to introduce an expert witness to swear Shawn Trap is talking about illegal drugs because the messages do not actually say that.

- Exhibit 6(z) (text messages dated 1/6/24 where Shawn Trap sends a picture of a bag containing a white substance to Mr. Copper) should not have been admitted because it is simply evidence Mr. Copper associates with a drug dealer, and guilt by association is prohibited.

- The United States' 404(b) exhibits were unfairly prejudicial because the United States overemphasized their importance to the jury. In addition, Intelligence Analyst Damien

Msciaz and Special Agent Stephen Johnston should not have been permitted to testify as experts because they were not previously identified as experts.

The United States responds Mr. Copper's disagreement with our evidentiary rulings on pretrial motions in limine does not form a basis for a new trial as the evidence overwhelmingly established Mr. Copper's guilt.[81] The United States does not respond specifically to each of Mr. Copper's evidentiary arguments.

We agree with the United States' conclusion though its response to Mr. Copper on the specific audio recordings and text messages lacks analysis. We need not reevaluate issues such as the remoteness of time of the admitted calls and messages, their probative versus prejudicial value, the extent to which the evidence might impermissibly show Mr. Copper's propensity to commit the charged crimes, the fact the people with whom Mr. Copper spoke were not charged with any crimes and/or were not co-conspirators, and the fact some of the calls and messages might have required the jury to draw certain inferences concerning Mr. Copper's illegal activities. We already considered these issues and concluded the exhibits were admissible to show Mr. Copper's knowledge, intent, and/or absence of mistake for one or more of the charged offenses (subject, in some instances, to the United States' supporting expert testimony).

So, we today only consider the issues which arose *at trial*. We specifically address Mr. Copper's argument the United States failed to connect Exhibit 4(a) to the firearms identified by the Grand Jury in the indictment; Mr. Copper's argument the United States' expert testimony about Exhibit 4(b) had to be, but was not, clear and unequivocal; and Mr. Copper's argument the Rule 404(b) exhibits were unfairly prejudicial because the United States overemphasized their importance and improperly designated witnesses as experts at trial to talk about the exhibits.

***Exhibit 4(a).*** We permitted the United States (over Mr. Copper's pre-trial objection) to introduce Exhibit 4(a) where Mr. Copper talks about a "two-piece chicken nugget" with an

incarcerated person on December 21, 2023. We admitted this evidence subject to the United States tying the conversation to the charged firearms through an expert opinion Mr. Copper was talking about a .22 caliber pistol.[82] We pause here to acknowledge an error on our part in thinking the Grand Jury charged Mr. Copper with possessing a .22 caliber pistol. We allowed Exhibit 4(a) into evidence believing Mr. Copper's mention of a "two-piece chicken nugget" plausibly referred to a .22 caliber pistol. We now realize our Grand Jury did not charge Mr. Copper with possessing a .22 caliber pistol. It charged him with possessing two 9mm semi-automatic pistols, one 10mm semi-automatic pistol, and one 9mm semi-automatic rifle.

Lieutenant Echevarria swore Mr. Copper and the other person on the phone were speaking about a small revolver during the December 21, 2023 conversation.[83] The Grand Jury did not charge Mr. Copper with possessing a small revolver; it charged him with possessing three pistols and a rifle. So, Mr. Copper is correct the United States did not tie the December 21 phone call to a charged firearm. We note the United States could not have drawn a connection even if Lieutenant Echevarria had sworn Mr. Copper and the other person were speaking of a .22 caliber pistol since the United States did not charge Mr. Copper with possessing a .22. In other words, there is no way the United States could have tied Exhibit 4(a) both to one of the charged firearms and also to a .22 caliber pistol. We cannot fault the United States for attempting to draw a connection under our March 13, 2025 Order. Mr. Copper did not raise at trial our confusion over firearms charged in the indictment versus firearms not charged. But Mr. Copper not objecting at trial is not really the issue. We acknowledge the December 21, 2023 conversation does not reference any of the charged firearms as raised in Mr. Copper's pre-trial objection to Exhibit 4(a).[84]

But even if Mr. Copper is correct the December 21, 2023 phone call constituted impermissible propensity evidence, its introduction to the jury does not warrant a new trial. The

jury heard other properly admitted evidence of Mr. Copper possessing the firearms charged in the Superseding Indictment. For instance, the jury heard evidence Mr. Copper knew how to operate a Glock (Exhibit 6(q)), evidence of Mr. Copper and someone named Steve discussing the price of 9mm firearms (Exhibit 6(r)), and evidence Mr. Copper knew about a Century Arms Draco pistol with a silencer (Exhibit 4(b)). Our admission of Exhibit 4(a) did not create a serious danger the jury convicted an innocent person; Mr. Copper is not entitled to a new trial on this basis.

**_Exhibit 4(b)._** We next turn to Mr. Copper's argument the United States' expert witness Detective Meoli could not testify "clear[ly] and unequivocal[ly]" about the code language in Mr. Copper's January 1, 2024 conversation with an incarcerated person because the speakers themselves did not understand the code.[85] First, we do not see significance in Detective Meoli's opinion the individuals had difficulty understanding each other. Even if that is true, **_the United States_** still gleaned important information from the call and relayed it to the jury. Detective Meoli testified, "Mr. Copper makes specific references that we found of value[,]" such as his reference to 9th and 10th street; his reference to a "quiet" firearm; and his references to "Drake" and "Romania," all of which denoted types of firearms found in the storage unit.[86] Second, Mr. Copper is incorrect an expert must be able to testify clearly and unequivocally; to the contrary, "[e]xpert witnesses need not be subjectively certain or totally convinced about their opinions for the testimony to be admissible."[87] We need not address the rest of Mr. Copper's concerns; we already considered relevance and propensity when we found Exhibit 4(b) admissible under Rule 404(b).

**_Allegedly prejudicial Rule 404(b) exhibits._** Mr. Copper lastly argues our admission of Exhibits 4(a), 4(b), 4(c), 6(q), 6(r), 6(y), and 6(z) under Rule 404(b) prejudiced him because the United States overemphasized their importance and because we improperly permitted two lay witnesses to offer expert opinions about one or more of the exhibits. Mr. Copper's "overemphasis"

argument is not compelling. Zealous advocacy is the cornerstone of trial practice, and in any event, it is the jury's responsibility to weigh the evidence presented.

Mr. Copper's argument we impermissibly allowed Department of Corrections Intelligence Analyst Damien Msciaz and Special Agent Stephen Johnston to testify as experts is equally unpersuasive. "[A] lay opinion must be rationally based on the witness's perception and 'firsthand knowledge of the factual predicates that form the basis for the opinion.'"[88] It is true both Intelligence Analyst Msciaz and Special Agent Johnston have some specialized knowledge from their jobs, which may have been apparent to the jury. But "a lay witness with first-hand knowledge can offer an opinion akin to expert testimony as long as the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion and is testifying based on experience or personal knowledge."[89] We find neither Intelligence Analyst Damien Msciaz nor Special Agent Stephen Johnston testified as experts; they testified as lay witnesses based on their own experience or knowledge.

The United States' attorney asked Intelligence Analyst Msciaz, whose job included listening to phone calls of incarcerated individuals, what he thought Mr. Copper and an incarcerated individual were talking about on calls from November 2023 to January 2024. Mr. Copper objected on the basis Intelligence Analyst Msciaz had not previously been identified as an expert to interpret the conversations he heard. We sustained this objection subject to the United States showing a basis for Intelligence Analyst Msciaz to testify. The attorney for the United States then asked Intelligence Analyst Msciaz how many calls he listened to between Mr. Copper and the incarcerated individual, to which Intelligence Analyst Msciaz responded "[a]t least dozens, if not a hundred."[90] Only after swearing to his experience did Intelligence Analyst Msciaz testify he believed Mr. Copper and the incarcerated individual "were talking about drugs and guns[.]"[91] We

find this is not expert testimony but lay testimony based on Intelligence Analyst Msciaz's job where he listened to hundreds of conversations between Mr. Copper and the incarcerated person.

The United States' attorney also asked Special Agent Stephen Johnston to opine whether the photograph of an AK style rifle in text messages between Mr. Copper and another individual depicted the same AK style rifle recovered from the storage unit. Mr. Copper objected arguing a lack of foundation. We overruled his objection and permitted Special Agent Johnston to offer his lay opinion based on his "years of experience in looking at these items" and his familiarity with the photograph and the rifle.[92] Special Agent Johnston, like Intelligence Analyst Msciaz, testified as a lay witness based on his own experience and knowledge.

Mr. Copper's arguments related to the United States' introduction of text messages and audio recordings fall far short of the "serious injustice" standard required for a new trial under Rule 33. We deny him a new trial on this basis.

## III.    Conclusion

We decline to grant Mr. Copper an acquittal finding the jury heard overwhelming evidence of Mr. Copper's guilt. We decline to grant Mr. Copper a new trial finding he has not established a serious risk our jury convicted an innocent person due to insufficient evidence. We likewise decline to grant Mr. Copper a new trial due to evidentiary concerns. We properly admitted the United States' evidence or the admission of a reference as to an uncharged firearm on a recorded tape did not create a serious injustice given the overwhelming weight of the evidence as to the charged firearms.

---

[1] ECF 1; *see also* ECF 17.

[2] Trial Tr. 57–75, Mar. 17, 2025 (ECF 105).

[3] *Id.* at 78–146; *see also* Trial Tr. 52–85, 94–135, Mar. 18, 2025 (ECF 106).

[4] Trial Tr. 33–48, Mar. 18, 2025 (ECF 106).

[5] *Id.* at 140–65, 169–86.

[6] *Id.* at 187–237.

[7] *Id.* at 257–79.

[8] Trial Tr. 24–44, 50–82, Mar. 19, 2025 (ECF 107).

[9] *Id.* at 96–160.

[10] Trial Exs. 7(a)–7(i); *see also* Trial Tr. 85–86, Mar. 17, 2025 (ECF 105).

[11] *See, e.g.*, Trial Exs. 5(c)(1)–5(c)(8) (still shots of Mr. Copper entering apartment building in King of Prussia); Trial Ex. 5(d)(2) (video of Mr. Copper exiting apartment 4320); Trial Ex. 5(e) (video compilation of Mr. Copper walking toward direction of storage unit and returning with backpack several times); Trial Ex. 9(tt) (photograph of key to storage unit found during search of apartment); *see also* Trial Tr. 123–37, Mar. 17, 2025 (ECF 105).

[12] Trial Tr. 3, Mar. 18, 2025 (ECF 106) (index of physical evidence).

[13] *See, e.g.*, Trial Ex. 8(a) (call details for Mr. Copper's phone number); Trial Exs. 3(c), 4(a), 4(b), 4(c) (video and audio calls between Mr. Copper and incarcerated individuals); Trial Tr. 100–14, 117–19, Mar. 17, 2025 (ECF 105); *see also* Trial Exs. 6(b), 6(d), 6(h), 6(q), 6(r), 6(y), 6(z) (text messages); Trial Tr. 148–64, Mar. 18, 2025 (ECF 106).

[14] Trial Tr. 52–81, Mar. 21, 2025 (ECF 111).

[15] Federal Rule of Criminal Procedure 29 requires us to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a) (governing motions for acquittal made before submission to the jury); *see also United States v. Curry*, No. 19-677, 2022 WL 445541, at *1 (D.N.J. Feb. 10, 2022) ("[M]otions for judgment of acquittal brought under Rule 29(a) and Rule 29(c) are decided under the same standard." (collecting cases)). "We interpret the evidence in the light most favorable to the government as the verdict winner and 'do not weigh evidence or determine the credibility of witnesses in making [our] determination.'" *United States v. Zayas*, 32 F.4th 211, 216–17 (3d Cir. 2022) (alteration in original) (quoting *United States v. Gambone*, 314 F.3d 163, 169–70 (3d Cir. 2003)). We must sustain the jury's verdict "if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt and if the verdict is supported by substantial evidence." *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006) (citing *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)). We "must simply determine whether 'the conclusion chosen by the factfinders was permissible.'"

*United States v. McGill*, 964 F.2d 222, 230 (3d Cir. 1992) (quoting *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984)).

Federal Rule of Criminal Procedure 33 allows us to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). We may grant a Rule 33 motion if the jury rendered a verdict "contrary to the weight of the evidence." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Unlike a Rule 29 motion, we do "not view the evidence favorably to the Government, but instead exercise[] [our] own judgment in assessing the Government's case." *Id.* (first citing *United States v. Lacey*, 219 F.3d 779, 783–84 (8th Cir. 2000); then citing *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988)). We may also grant a Rule 33 motion if evidentiary errors "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)). Rule 33 motions "are not favored and should be 'granted sparingly and only in exceptional cases.'" *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)). We may grant a Rule 33 motion "only if" we identify "a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* at 1004–05 (quoting *Johnson*, 302 F.3d at 150).

[16] ECF 113 at 11–15 (using the pagination assigned by the Cm/ECF docketing system).

[17] *Id.* at 14–15.

[18] ECF 116 at 8–10 (using the pagination assigned by the Cm/ECF docketing system).

[19] *Id.* at 10–11.

[20] *Id.* at 11–12.

[21] *Id.* at 12–13.

[22] *Id.* at 13.

[23] Trial Tr. 124:23–125:4, Mar. 19, 2025 (ECF 107).

[24] *Id.* 140:19–22, 143:16–18.

[25] Trial Tr. 201:24–203:25, 241:10–242:9, Mar. 18, 2025 (ECF 106).

[26] Trial Ex. 6(y); *see also* Trial Tr. 130:19–131:9, Mar. 19, 2025 (ECF 107).

[27] *See United States v. Johnson*, 452 F. App'x 219, 223 (3d Cir. 2011) (citing *Johnson*, 302 F.3d at 149). Mr. Copper's argument that Community Director Greear never received a complaint of drug dealing in apartment 4320 is also unpersuasive. The fact she never ***heard*** about drug dealing in the apartment does not mean Mr. Copper was ***not*** dealing drugs in the apartment—a conclusion the jury likely also drew.

[28] *Allen v. Chamberlain*, No. 08-2772, 2009 WL 413083, at *9 (E.D. Pa. Feb. 18, 2009) ("Following a lawful trial and proper instructions, and in the face of the jury's conclusion that Petitioner was an accomplice to robbery, the court cannot now infer from the jury's question that the jury in fact did not believe Petitioner was an accomplice to robbery.").

[29] *Johnson*, 302 F.3d at 149 (first citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); then citing *United States v. Gumbs*, 283 F.3d 128, 136 (3d Cir. 2002); and then citing *United States v. Pressler*, 256 F.3d 144, 149 (3d Cir. 2001)).

[30] *Silveus*, 542 F.3d at 1005 (quoting *Johnson*, 302 F.3d at 150).

[31] ECF 113 at 16–20.

[32] ECF 116 at 11–18.

[33] *Id.* at 13, 18–20.

[34] *United States v. Webster*, 400 F. App'x 666, 668 (3d Cir. 2010) (quoting *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992)).

[35] *Id.* at 668–69.

[36] Trial Tr. 13:19–14:1, 104:8–106:23, Mar. 18, 2025 (ECF 106).

[37] Trial Tr. 78:12–16, Mar. 19, 2025 (ECF 107).

[38] *Id.* 80:18–23.

[39] *See, e.g.*, Trial Tr. 109:4–24, Mar. 17, 2025 (ECF 105); Trial Exs. 6(b), 6(d); Trial Tr. 151:19–152:3, 153:18–22, 154:9–155:16, 155:22–157:9, Mar. 18, 2025 (ECF 106).

[40] Trial Ex. 6(d); Trial Tr. 155:22–157:9, Mar. 18, 2025 (ECF 106).

[41] *United States v. Sparrow*, 371 F.3d 851, 853 (3d Cir. 2004) (quoting *United States v. Ceballos-Torres*, 218 F.3d 409, 414–15 (5th Cir. 2000)), *amended on reh'g in part*, 226 F.3d 651 (5th Cir. 2000), *as amended* (Aug. 3, 2004).

[42] Trial Tr. 13:19–14:1, 104:8–106:23, Mar. 18, 2025 (ECF 106).

[43] *Id.* 105:4–7.

[44] Trial Tr. 151:3–7, Mar. 19, 2025 (ECF 107) ("[I]f you're going to protect that product you would like to not have any attention come to yourself by firing a gun, if possible, by having a silencer that's quieter where it doesn't attract the same attention it does.").

---

[45] *Id.* 145:6–19.

[46] ECF 113 at 18.

[47] *Id.*

[48] *Id.* at 19.

[49] *Zayas*, 32 F.4th at 216–17 (quoting *Gambone*, 314 F.3d at 169–70).

[50] *Bobb*, 471 F.3d at 494.

[51] *Johnson*, 302 F.3d at 150.

[52] The enhanced penalty provision under section 924(e) also requires the three earlier convictions be for violent felonies or serious drug offenses, but this element is a legal determination not decided by the jury. We address this concern at sentencing.

[53] ECF 113 at 61–62.

[54] *Id.* at 62.

[55] *Id.*

[56] *Id.* at 63 (quoting *Miranda v. Arizona*, 384 U.S. 436, 468 n.37 (1966)).

[57] *Id.*

[58] *Id.* at 64.

[59] ECF 116 at 21–22.

[60] *Miranda*, 384 U.S. at 478–79.

[61] *Id.* at 468 n.37.

[62] *M.B. ex rel. T.B. v. City of Phila.*, 128 F. App'x 217, 227 (3d Cir. 2005) (citing *Pa., Dep't of Transp. v. Mitchell*, 535 A.2d 581, 585 (Pa. 1987)).

[63] Trial Tr. 72:15–73:11, Mar. 21, 2025 (ECF 111).

[64] ECF 113 at 64.

[65] Trial Tr. 75:2–9, Mar. 21, 2025 (ECF 111).

[66] *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672, 681 (3d Cir. 1980) (quoting *Belmont Indus., Inc. v. Bethlehem Steel Corp.*, 512 F.2d 434, 438 (3d Cir. 1975)); *see also United States v. McGhee*, No. 07-733, 2012 WL 1382573, at *10 (E.D. Pa. Apr. 20, 2012) ("In the first place, defense counsel did not object to the introduction of this testimony at the time of trial . . . and therefore, this cannot be grounds for the grant of a new trial."), *aff'd*, 522 F. App'x 130 (3d Cir. 2013).

[67] ECF 113 at 20–26.

[68] *Id.* at 28–39.

[69] *Id.* at 26–27, 33–34, 39–40.

[70] ECF 116 at 22–24.

[71] *Id.* at 23–24.

[72] *Id.* at 24.

[73] *Silveus*, 542 F.3d at 1005–06 (quoting *Johnson*, 302 F.3d at 150).

[74] *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[75] *Id.* (quoting *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993)).

[76] *Id.*

[77] ECFs 36, 37, 38.

[78] ECF 49 at 6.

[79] *Id.* at 6–7.

[80] *United States v. Ndubizu*, No. 22-318, 2024 WL 4224630, at *3 (D.N.J. Sept. 18, 2024); *see also United States v. Pitts*, No. 10-703, 2011 WL 5142682, at *10 (E.D. Pa. Oct. 31, 2011) (denying motion for new trial based on court's earlier denial of motion to suppress because "[t]he law has not changed, no newly discovered facts have been alleged, and nothing has occurred that would make the Court reverse its previous decision"), *aff'd*, 497 F. App'x 252 (3d Cir. 2012).

[81] ECF 116 at 24–25.

[82] ECF 83 at 18–19.

[83] Trial Tr. 116:15–23, 117:17–118:4, Mar. 19, 2025 (ECF 107).

[84] *See* ECF 64 at 37–38.

[85] ECF 113 at 47.

[86] Trial Tr. 109:1–24, Mar. 17, 2025 (ECF 105).

[87] *Krantz v. Steiler*, No. 21-1217, 2024 WL 1494182, at *7 (M.D. Pa. Apr. 5, 2024) (alteration in original) (quoting 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.05).

[88] *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 225 (3d Cir. 2008) (first quoting *Gov't of V.I. v. Knight*, 989 F.2d 619, 629 (3d Cir.1993); then citing *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002)).

[89] *Universal Atl. Sys., Inc. v. Bos. Mkt. Corp.*, No. 20-5291, 2022 WL 13829825, at *16 n.12 (E.D. Pa. Oct. 21, 2022) (first citing FED. R. EVID. 701; then citing *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 356 (3d Cir. 1998)).

[90] Trial Tr. 67:20–21, Mar. 17, 2025 (ECF 105).

[91] *Id.* 68:14–15.

[92] Trial Tr. 151:14–18, Mar. 18, 2025 (ECF 106).